Johnny Lee Bullock                    )
                                      )
        Plaintiff                     )
                                      )
        V.                            )        Civil Action No. 07-1013(ESH)
                                      )
Department of Justice, et al          )
                                      )        **RECEIVED**
        Defendants                    )
                                      )

                Paintiff Johnny Lee Bullock        JUN 1 6 2008

                                            NANCY MAYER WHITTINGTON, CLERK
                                                  U.S. DISTRICT COURT

            CROSS MOTION FOR SUMMARY JUDGEMENT


Comes now Pro Se Plaintiff Johnny Lee Bullock asking this honorable
court to grant him summary judgement as to Defendants (FBI) and (DEA)
and narrow the litigation down to only agencies (FBI) and DEA) and
grant Defendants United States Marshalls Service (USMS) and Executive
Office of United States Attorneys (EOUSA) summary judgement as
Plaintiff has no materials facts in dispute with said agencies.
Plaintiff also requests this honorable court to grant defendant (FBI)
summary judgement as to main files 76-HQ-40319, 76-HQ-51525, 26-HQ-
436858, and 76-HQ-40319-76-HQ-51525 and to grant Plaintiff summary
judgement as to main investigative file 245-LS-64574.


Some of this material was released to Plaintiff by the United States
prosecuting attorney.  The Drug Enforcement Agency is withholding
five(5) pages of material that have also been released at a criminal
trial.  SeeCivil Action No. 07-1013(ESH), Exhibit M.  Pages in dispute
are "8" and "9" of a three page report of Investigation (ROI) DEA
Form 6, describing the acquisition of a drug exhibit from the Plain-
tiff and pages "13" through "15", comprising a three page description
of the acquisition of a drug exhibit from the Plaintiff.  See

                                1

declaration of Leila I. Wasson, page 4 at 11. DEA informed Plaintiff
by letter dated 16 January 2007 that five(5) pages were witheld in
their entirety citing exemptions (b)(2), (b)(7)(c), (b)(7)(d), and
(b)(7)(f). The five pages the DEA is withholding is material from
Plaintiff that was released to him by the United States Attorney's
office at a criminal trial. The government can not now claim any
exemptions . The five pages the DEA is witholding are already in
the public domain. The government cited exemption (7)(d) as to
informant (CW) Stacy Crain when her identity had already been released
through Discovery tape released by the United States District Court,
Eastern District of Kentucky London. See exhibit (A), Criminal No.
01-21, United States of America v. Johnny Lee Bullock at "9", copy
of audio tape labeled "12/7/00, 1/4 oz. meth buy", Johnny Lee Bullock,
at "10" copy of audio tape labeled "1/16/01, 245C-LS-64574, CW AND
Johnny Lee Bullock, 1/2 oz. meth buy". The United States District
Court released the identity of confidential source, CW Stacy Crain,
through Discovery audio tape labeled "12/7/00", and audio tape
labeled "1/16/01, 245C-LS-64574, CW and Johnny Lee Bullock".

Plaintiff asks this court to look at the second declaration of David
M. Hardy, government exhibit 1, page "10" at "31", investigation file
245-LS-64574, same as audio tape labeled "1/16/01". Also see David
M. Hardy, page "11" at "32", stating that on 10 January 2008 the FBI
conducted an ELSUR[3] search and located one responsive audio tape
which Defendant (FBI) witheld from disclosure pursuant to 5 U.S.C.
552(b)(6), (b)(7)(A), (b)(7)(C), and (b)(7)(D). Two tapes were re-
leased to the Plaintiff. See exhibit A, Discovery, also exhibit B
and C, Uniform Offense Report Case No. 33-00-0793 and Uniform Offense
Report Case No. 33-00-0040, report of Detective Tom McKnight, 7

December 2000. At approximately 1349 hours, FBI recorder was de-activated and FBI SA Briggs recieved custody of recording device, exhibit C. Uniform Offense Report by Det. Tom McKnight states that at approximately 1242 hrs. on Tuesday, January 16, 2001, FBI SA Briggs activated an FBI recording device worn by CW 00-976. The recording device was deactivated at 1306 hrs. with FBI SA Briggs recieving custody of recording device. Two recording divices SA Briggs has taken custody of and Plaintiff recieved two copies of audio tapes, one labeled "12/7/00" and one labeled "1/16/01 245C-LS-64574".

Now is the Federal Bureau of Investigation going to clock back exemp-tions when they, the government, released them into the public domain and defendants can not claim privacy harm to CW informant Stacy Crain as she is deceased? See exhibit D, Obituaries, Mt. Vernon Signal. Stacy Crain died on 5 May 2001. Also see Exhibit E, Department of Justice Drug Enforcement Administration Report of Investigation, date prepared- 12/8/00. "Custody of non-drug evidence (video/audio tapes, etc.) was taken into and will remain in the custody of the Kentucky State Police. See exhibit B, uniform Offense Report. Detective Tom McKnight stated "I released the recorder to SA Briggs." Two different reports, two diferent stories, same tape.

Informant CW Stacy Crain made three tapes: One on 12/7/00 and Two on 1/16/01. On tape one, informant CW Stacy Crain can be heard talking to James Isaacs, Steve Blair, and Vernon Denny about drugs. She then asks Johnny Lee Bullock if they charged her too much for rhe drugs. On tape Two, 1/16/01 audio recorder, SA Briggs activated the device at approximately 1244 hrs. while enroute to Johnny Lee Bullock.

Informant CW Stacy Crain can be heard talking to Det. Tom McKnight about her mother committing suicide and saying that she was going to do the same or guessed she would kill herself too. At approximately 1300 hrs. informant CW Stacy Crain entered Johnny Lee Bullock's home. On the audio tape there is nothing about drugs, only talk about cars and motors. Stacy Crain can be heard talking to Jack Bullock about wrecking her car and wrecking his truck. On this tape are the voices of Vernon Denny, Jack Bullock, James Isaacs, Johnny Bullock, and Melissa Milburn. There is no Alexia Crain present. See exhibit I, Plaintiff's transcript, page 109, lines 17 and 18 on January 16th that Detective Alan Lewis prepared DEA-6 Report of a Debriefing. After purchase of narcotics, defendant DEA must release the DEA-6 reports as they were used at a public trial. This honorable court should order defendants FBI and DEA to release this audio tape and the attendant DEA-6 reports. See Cottone v. Reno 193-F.3d. at 550, 554-555 (DC Cir. 1999). Also see Callahan v. Exectutive Office For U.S. Attorneys No. 98-1826 Slip OP. at 3 D.D.C. Apr. 18.202 ordering the release of court-filed documents on the basis that they were already in the public domain.

Plaintiff's interest goes beyond attacking his conviction when the government prepared and falsified documents. This is something Plaintiff knows for a fact: The January 16th DEA-6 report by Detective Alan Lewis. All this court needs to do is look at this one report, the one in Plaintiff's exhibit H and the one from the DEA. The goverment can not claim Exemption 7 as they do not apply to these DEA 6 reports because they became public records once the government released them to Plaintiff's attorney. The government used this docu-

4

ment to place Alexis Crain's name and the false brown pill bottle of drugs. Plaintiff could have proved that this brown pill bottle of drugs did not come from him. The government knew this did not come from the Plaintiff. Now they are asking this court to grant them exemption (7's), protections.

There were three(3) buys made by informant Stacy Crain. See exhibit F of Informant Code Number 00-976, Record of Use and Reliability. So if she made three buys for the government, then there must be three DEA-6 reports and/or three audio tapes. However there were only two audio tapes released to Plaintiff and two DEA-6 reports. Plaintiff does have the two audio tapes. Plaintiff's attorney, Fred White, mailed the two audio tapes to Plaintiff's home so Plaintiff thinks tape No. 3 is the one the FBI has hidden in their investigation file and is this one of the two that has been released into the public domain or is this Bready v. Maryland material that the FBI is witholding because this tape lets the cat out of the bag? Either way, Plaintiff has a right to this tape. Tape No. 3 has informant Stacy Crain introducing Alexus Crain to Johnny Lee Bullock sometime after 8 p.m. on January 16th, 2001 and shows the DEA-6 report that Alexus Crain was not at Plaintiff's home at 1:06 p.m. and that this DEA-6 report is fabricated and false.

There is nowhere in the Defendant's motion for summary judgment that the Defendants argued or tried to explain why the release of these documents or audio tape that was already in the public domain would interfere with enforcement proceedings or cause any physical harm. The FBI claims exemption (b)(7)(D) on pages "Bullock" 40, 41, 45, 51, 55, 56, 105, 112, 113, 133, 198, 204, 280-282, 296, and 297. Hardy Dec. '78 that information these third parties provided was under an

implied grant of confidentiality. As this court can see in uniform offense report, Stacy Crain was a cooperating witness (CW) No. 00-976. See exhibit C, also see exhibit A. The first piece of discovery Plaintiff recieved was two tapes of the CW and Johnny Lee Bullock, so it's a fact that the police, FBI/DEA, or the United States Attorney was not trying to protect (CW) Stacy Crain's identity. The government released her identity months before Stacy Crain died so Plaintiff Johnny Lee Bullock is having one hard time trying to find where the government provided any protection for Stacy Crain's identity. See second declaration of David M. Hardy, page 35. Exemption (b)(7)(D)-2 has been asserted to protect the name, identifying information under an express grant of confidentialty. It's palin to see that there protection from the FBI or any other part of the government for (CW) Stacy Crain. The harm has been done when she informed the government that she was going to kill herself. What is our government up to when our citizens inform them on an investigation audio tape recorder, talking to a government officer, that they are thinking about suicide while    being used in a drug investigation? Once the Plaintiff was arrested (CW) Stacy Crain left town, became a fugitive, and ran out on them. The government had no witness.

Plaintiff is Pro se but he has read enough that it is his understanding that agencies such as the FBI and DEA had to file their reports. That is why the Plaintiff files this Civil Action. At the time agency FBI and agency DEA filed their investigation reports, witness Stacy Crain was a fugitive but was alive. The government knew it was just a matter of time before they would find their witness. While looking for witness Stacy Crain, the police arrested Alexus Crain on drugs and money

laundering charges. When Stacy Crain turned up dead, police knew that Alexus Crain had been to Johnny Lee Bullock's house once with her step-mother because on tape three she had been introduced to Johnny Lee Bullock and Alexus Crain was at Plaintiff's house on January 16th from around 8:40 p.m. until 3 a.m. on January 17th. The drugs Stacy Crain left with from Plaintiff's could not be the same drugs she had turned over to the police, a brown pill bottle. That was at approxi-mately 1306 hrs. on January 16th, 2001 and was submitted by Det. Alan Lewis and recieved at Southeastern REgional Forensic Laboratory (Date: 1/16/01, Time:1520 hrs. Cellophane bag containing 13.783 grams- 0.486 ounces- of a light brown substance). See exhibit G, Report For Forensic Laboratory Examination.

At the trial the government introduced a brown pill bottle into evidence, NOT the cellophane bag that had been turned over and recieved by the Forensic Laboratory that Plaintiff was indicted for. So Plaintiff informed and complained to his attorney that the deceased informant had this pill bottle of drugs and took some out and put them on the coffee table around 10:10 p.m. January 16th, 2001. Attorney Fred White said he would check into it. Now the government had just intro-duced a pill bottle of drugs that was of a third controlled buy that Plaintiff had not been indicted for. See Exhibit F, informant code number 00-976, Record of Use and Reliability.

PLaintiff's attorney went to the United States attorney about the evidence that had been admitted. This is where the trouble for the government started, but they had one hole card- the informant was deceased so all they had to do was re-do the investigation reports.

None had been released through discovery.  See exhibit A, Discovery.
Also see exhibit C, Uniform Offense Report.

Det. Tom McKnight stated (CW) provided a prescription pill bottle
containing suspected Meth.  See exhibit H, Department of Justice
Drug Enforcement Administration, three pages.  These three pages
are part of the five(5) pages withheld by the DEA and were placed
in exhibit M, Johnny Lee Bullock, Plaintiff V. Federal Bureau of
Investigation, et. al., Civil Action No. 07-1013(ESH).  As Exhibit
M Plaintiff made redactions as to the ones in exhibit M in fear of
agency DEA copying, Plaintiff asks this court to see Declaration of
Leila I. Wassom, page 24, lines 73 and 74, stating that the pages
contain information about the drug trafficking interaction between
an FBI/Kentucky State Police/ Laurl County, Kentucky confidential
source.  The information about the Plaintiff is inextricably
intertwined with information about the confidential source and
third parties.  Release of any of the information could enable the
Plaintiff to identify the confidential source, if declarant read
and was familiar with the Plaintiff's complaint.  Then declarant
Wassom read exhibit M of Plaintiff's Complaint, so declarant Wassom
knew the DEA was withholding information from Plaintiff that had
already been released into the public domain.  The government may
not rely on an otherwise valid exemption to justify withholding
information that has officially entered the public domain.  The
government did not file a proper Vaughn index by withholding
entire documents without making segregability.  Plaintiff is not
just suspicious or on a fishing expedition as to what the govern-
ment DEA and FBI agencies are up to.  The DEA fabricated evidence

8

when TFO Alan Lewis prepared the DEA Form-6 and Form-6-a dated 1/17/01, singed by (Agent) TFO Alan Lewis, and Approved by Jerry Carmack (A/RAC). This is a DEA-6 and DEA-6a, three page report.

Plaintiff Johnny Lee Bullock is having trouble understanding this document. Some of the names don't match. This document has a name, John Bullock, not Jack Bullock; has a name, Alexus Crain instead of Melissa Milburn. This document is false: At 1:04 p.m. January 16th, 2001, Alexus Crain had not been introduced to Plaintiff. This did not happen until about 8:40 p.m. on January 16th, 2001 at which time step-mother, Stacy Crain, introduced her as her step-daughter. This is where the brown pill bottle comes into the picture. Informent Stacy Crain left Alexus Crain at Plaintiff's house at 10:10 p.m. and, taking some drugs from a brown pill bottle, left it on Plaintiff's coffee table, would he do the drugs with Alexus Crain and that she had to go meet someone and would be back later to pick her up.

This DEA-6 Report is a false document. Plaintiff recognized the brown pill bottle of drugs when the government introduced it at the trial. Plaintiff informed his attorney and his attorney went to the United States Attorney about false evidence being introduced by the government. This document was prepared and released to the Plaintiff's attorney so he would not investigate the false evidence that had been introduced.

This one DEA-6 Report of agency DEA and the one audio tape from agency FBI should shed enough light on defendants to let this court see what our government is up to as none of the exemptions Defendants DEA and FBI cited apply as the United States Attorneys

9

released Report of Investigation, DEA Form-6, and informant Stacy Crain is dedeased. The Department of Justice should not be able to fabricate false evidence, then try to hide behind Exemption (7). One reason that the FOIA was designed for is to check against corruption and to hold the governers accountable to the governed. Indeed, information that would inform the public of violations of the public trust has a strong public interest and is accorded great weight in the balancing process. As a general rule, demonstrated wrondoing of a serious and intentional nature by a high level government official is of sufficient public interest as to out-weigh almost any privacy. See Cottone 193 F.3d at 555-56, finding waiver where Plaintiff has identified tapes in the public domain.

Plaintiff has identified two tapes the government has released into the public domain.

Wiretapped recordings obtained pursuant to Title 111 of The Omnibus Crime Control and Safe Streets Act of 1968 are ordinarily exempt from disclosure under the Freedom Of Information Act (FOIA) exemption protecting information specifically exempted from dis-closure by another statute except as subject to "Public Domain Doctrine" under which materials normally immunized from disclosure under FOIA lose their protective cloak once disclosed and preserved in a permanent public record, 5U.S.C.A. 552(b)(3); 18 U.S.C.A. 2510-2521.

Freedom of Information Act (FOIA) requester was entitled to disclo-sure of wiretapped recording obtained pursuant to Title 111 of the Omnibus Crime Control and Safe Streets Act of 1968 since these ordinarily exempt recordings had entered the public domain when

played in court and recieved into evidence in requester's criminal trial. Requester produced Certified Transcript from his trial that indicated precisely which tapes were played and government made no showing that specific tapes or records identified had since been destroyed, placed under seal, or otherwise been removed from public domain.

Once requester has carried his burden of production in showing that otherwise exempt record have entered the public domain, it is up to the government, if it so chooses, to rebut requester's proof by demonstrating that the specific tapes or records identified have since been destroyed, placed under seal, or otherwise been removed from the public domain. In Cottone V. Reno, 193 F.3d-550(D.C.Cir 1999, this court made it clear that audio tapes enter the public domain once played and recieved into evidence, that a trial is a public event, and what transpires in the courtroom is public property. Therefore, until destroyed or placed under seal, tapes played in open court and admitted into evidence- no less than the court reporter's transcript, the parties' briefs, and the judge's orders and opinions- remain a part of the public domain.

Wherefore Plaintiff Johnny Lee Bullock asks this court to look at Exhibit I, Plaintiff Transcript, where two(2) audio tapes were played in open court. Plaintiff has identified the tapes which were played in open court. See Plaintiff's Exhibit I, page 28 of court transcript where two(2) tapes were listened to, one six minutes and one seven minutes. Also se Exhibit I, page 51 of Plaintiff's transcript where DEA-6 Report of Investigation titled Aquisition of Information. Plaintiff has placed proof in

11

in his exhibits to this honorable court that the FBI and DEA have withheld documents from Plaintiff and that none of the stated exemptions apply. This court must order defendants FBI and DEA to release all non-exempt material. See Iron V. FBI 811 F.2d, 681-685. What matters is whether or not the information, be it a sophisticated design for limpet mines or a mundane laudry list, would disclose the identity of a confidential source, each particular interest must be weighed. Whether the subject is deceased is one such consideration.

Plaintiff has a constitutional right to any Brady V. Maryland material. If tape three is the one the FBI is withholding, then tape 3 lets the cat out of the bag if it shows Johnny Lee Bullock did not sell the drugs the government used against Plaintiff at a criminal trial. See Irons V. FBI 880 F.2d 1461 (1999). Generally it is the government which triggers the testimony. The recipient agency delivers the confidential information to, say, a prosecutor precisely because it is agreeable that the identity of the source and the brunt of the information be revealed in a public forum to serve some government end. In that sense, the agency itself has decided that disclosure is worth the candle. Most notable of all, the majority is silent about whether a court can infer waiver from the government's conduct. We believe not only that a court can, but that it should. There is a powerful reason grounded in fairness to require that a federal agency digorge the information it was presumably willing to reveal in court when it elected to have the tapes played in open court. Information, once opened to the public purview, might serve the ends of justice and openess. A chance to obtain the whole story

is the exact aim of the Freedom of Information Act.

For the facts stated in Plaintiff's Motion and Proof of the Exhibits, Plaintiff Johnny Lee Bullock prays this honorable court will grant him cross summary judgement.


Respectfully Submitted

Johnny Lee Bullock #No. 07890-032
United States Penitentiary
P.O. Box 1000
Marion, Illinois - 62959

## CERTIFICATE OF SERVICE

I hereby certify that copies of the foregoing Plaintiff's Motion
For Summary Judgement Statement of Material Facts, were mailed


To:  Alexander D. Shoaibi, DC Bar No. 423587

     Assistant United States Attorney

     Civil Division

     555 Fourth Street, N.W.- Room E-4218

     Washington, D.C. 20530




                              Signed: *Johnny Lee Bullock*
                                      Johnny Lee Bullock

                              Date: *6- 12- 2008*

# EXHIBIT A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
LONDON

CRIMINAL NO. 01-21

UNITED STATES OF AMERICA

V.                              DISCOVERY

JOHNNY LEE BULLOCK

\*   \*   \*   \*   \*

This is to certify the receipt of the below-listed discovery items in the above-styled case:

1. Copy of search warrant, application and affidavit for search warrant, attachments, return and evidence recovery log for 01-6006M, 11 pages

2. Copy of search warrant, application and affidavit for search warrant, attachments, return and evidence recovery log for 01-6007M, 11 pages

3. Copy of criminal history, 10 pages

4. Copy of buy money ($500.00) used to buy 1/4 oz. Methamphetamine from Bullock 12/7/00, 3 pages

5. Copy of Laboratory Report Number 00-5-04348, 1 page

6. Copy of Laboratory Report Number 01-5-00159, 1 page

7. Copy of Laboratory Report Number 01-5-00251, 1 page

8. Copy of personal documents recovered from search, 42 pages

9. Copy of audio tape labeled "12/7/00, 1/4 oz. meth buy, Johnny Lee Bullock"

10. Copy of audio tape labeled "1/16/01, 245C-LS-64574, CW & Johnny Lee Bullock, ½ oz. meth buy

11. Copy of 11 color photographs from first search, 4 pages

12. Copy of 10 color photographs from second search, 4 pages

13. Copy of 6 black & white photographs of individuals, 6 pages

14. Copy of portion FD-302 containing statement of Johnny Lee Bullock to SA Timothy S. Briggs, 2 pages

15. Copy of video tape labeled "Johnny Lee Bullock, search, 2 trailers, 1/23/01"

_____
Jim Hibbard, Esquire
Attorney-at-Law

_____
Stephen C. Smith
Assistant U. S. Attorney

_____
Date

_____
Date

# EXHIBIT B

CONTINUATION PAGE/SUPPLEMENTARY
UNIFORM OFFENSE REPORT

ORI KYKSP3300

Case Number: 33-00-0793

Title of Investigation: Distribution of Methamphetamine

Violation Code: 91000

SUPPLEMENTS:

On Thursday, December 7th, 2000 I was assigned to act in an undercover capacity in Rockcastle County, KY concerning a Methamphetamine purchase involving CW #00-976, from Mr. Johnny Lee Bullock. Conducting surveillance during the investigation was KSP Sgt. Robbie Massie, KSP Detective Alan Lewis, FBI S/A Tim Briggs, DEA S/A Jerel Hughes, and Laurel County Chief Deputy Buddy Blair.

My assignment was to drive cooperating witness (CW) #00-976 to the Johnny Lee Bullock residence, located off KY 1249 (Sand Springs Road) where said CW was attempting to purchase ¼ ounce of Methamphetamine from Mr. Bullock. The CW and I proceeded to the Bullock residence with this officer, operating a FBI undercover vehicle. Approximately 1318 hours I activated a FBI recorder worn by the CW. Approximately 1324 hours, we arrived at the Bullock residence, with CW advising Jimmy Isaacs was standing on Bullock porch, conducting counter-surveillance observing KY 1249. The CW was searched by this officer prior to our arrival at the Bullock residence.

Approximately 1324 hours, the CW entered the Bullock residence, with this officer remaining inside the undercover vehicle. I observed an unidentified W/M attempting to start a Ford tractor at rear of residence, using starting fluid. His location was approximately 15 yards from my parked position. I observed several vehicles parked at residence, both able and disabled, recording several tag numbers on recorder.

Approximately 1335 hours, the CW exited the residence following Freddy Denny, who was carrying what appeared to be aluminum foil in his hand. Denny entered his vehicle and exited driveway. Approximately 1337 hours I received a substance identified as Methamphetamine from the CW. Approximately 1349 hours I deactivated FBI recorder. Shortly thereafter, I met with all surveillance units at a discrete location, after once again searching the CW's person.

I released the recorder to S/A Briggs as well as the suspected Methamphetamine to Detective Lewis. Further investigation continuing.

| Detective Tom McKnight | 973 | | 12-28-00cb | |
| --- | --- | --- | --- | --- |
| Officer Making Report | Badge No. | Time Spent | Date | Reviewed By |

33-00-0793-9

J-93

# EXHIBIT C

CONTINUATION PAGE/SUPPLEMENTARY
UNIFORM OFFENSE REPORT

ORI KYKSP3300

Case Number: 33-01-0040

Title of Investigation: Distribution of thamphetamine

Violation Code: 91000

SUPPLEMENTS:

On Tuesday, January 16,2001 a meeting was held in Rockcastle County, KY between KSP Sgt. Rob Massie, Det. Alan Lewis, FBI S/A Briggs, Laurel SO Deputy Blair, Cooperating witness (CW) #00-976 and this officer, concerning an attempted ½ oz meth purchase form Johnny Lee Bullock, Rockcastle, County KY.

S/a Briggs furnished a FBI recording device with Det. Lewis furnishing copied US currency (KSP) in the amount of $925.00, to the CW in my presence. My role in the purchase was to drive the CW to the Bullock residence in on undercover capacity.

Approximately 1242hrs, S/A Briggs activated the recording device worn by the CW. Approx 1244hrs. the CW and I left the discreet staging area enroute to Bullock residence, with other officer's conducting loose mobile surveillance. The CW and I were traveling in an undercover FBI vehicle, with this officer operating said vehicle.

Approximately 1246hrs I turned left onto Sand Springs Road (KY1249). We traveled on Sand Springs Road until reaching Sowder School Road, where I turned left onto said Sowder School Road.

I traveled on Sowder School Road approx 9/10 mile until reaching the Bullock driveway located on the left side of Sowder School Rd. turning left onto the driveway approx 1254hrs.

Immediately after turning into the driveway and approaching Bullock's mobile home, I observed a W/M, identified later as Jimmy Isaacs, proceeded from the end of the mobile home into rear yard area as CWS exited U/C vehicle. Isaacs approached my vehicle (passenger side) staring at this officer. I asked Isaacs if it was cold enough for him, to which he replied he wished it would get a little colder to freeze the mud around the Bullock residence. It was clear Isaacs was conducting couter-surviellance and observing vehicles of potential narcotic customers. The CW departed the U/C vehicle approx 1254hrs.

After the short conversation with Isaacs, he remained outside the mobile home, appearing to be picking up objects in the rear area. I continued watching Isaacs, until approx 1257hrs. at which time I observed a W/M, later identified as Johnny Lee Bullock, exit rear door of mobile home, travel

| Det. Tom Mcknight | 973 | | 01-22-01dj | |
|---|---|---|---|---|
| Officer Making Report | Badge No. | Time Spent | Date | Reviewed By |

33-01-0040-13

CONTINUATION PAGE/SUPPLEMENTARY
UNIFORM OFFENSE REPORT

ORI KYKSP3300

Case Number: 33-01-0040

Title of Investigation: Distribution of thamphetamine

Violation Code: 91000

toward my vehicle, walk along side the drivers door of vehicle, toward a disabled red GMC dump truck parked on curtilage.

I observed Bullock in rear side window approach the dump truck's passenger side fender well, reach up in fender well and extract an object, and leave the truck carrying a white object in his right hand. Bullock proceeded once again beside my vehicle, back into the mobile home. Approx 1303 hrs. the CW exited rear door of mobile home, entering the U/C vehicle. Approx 1304hrs, upon leaving residence and on Sowder School Road the CW provided a prescription poll bottle containing suspected meth. I received said prescription bottle from the CW, and searched him/her approx 1306hrs. I deactivated the recording device worn by the CW. Later I met with other investigating officers at a discreet location, with Det. Lewis receiving suspected meth, and S/A Briggs receiving recording device.

Later, Det. Lewis conducted a short debriefing with the CW, to which I was present. I later relayed the CW to his/her vehicle.

Further investigation continuing.

STATUS OF CASE:        Open

Det. Tom Mcknight

973

01-22-01dj

Officer Making Report

Badge No.

Time Spent

Date

33-01-0040- 14

# EXHIBIT D

*In "May 10, 2001 issue of "The McClenon Signal."*

*For: Eula Kirby*

*P. Anderson, Publisher*

# uaries

Jack of Mt. Vernon; four sisters, Lillie Saylor, Ruth Weaver and Dollie Roberts, all of Mt. Vernon and Bonnie Crowe of Florida; four grandchildren, Roy Stephen Martin, Jeffrey Dale Winstead, Gina Lynnette Masters and Roy Scott Winstead and four great grandchildren, Roy Scott Winstead II, Justice Healey Masters, August Isabella Winstead and Ryan Connor Martin. He was preceded in death by five brothers, Isaac, Edd, Gaines, Clinton and Kinzie Winstead and two sisters, Mattie Cromer and Betty Bullens.

Services were Wednesday, May 9, at the Dowell & Martin Funeral Home with Bro. Wendell Romans officiating. Burial was in the Cresthaven Memorial Cemetery.

Pallbearers were Jack Lawless, Steve Martin, Jensen Masters, Jeff Winstead, Jimmy Lee Winstead and Scott Winstead.



## Stacy Crain

Stacy Lynn Durham Crain, 26, of Lily, died Saturday, May 5, 2001 in Hopkinsville. She was born in Rockcastle County on April 15, 1975, the daughter of Boyd and Judy Gail Coffey Durham. She was an order filler for Gibson Greeting Cards and

attended Freedom Baptist Church.

Survivors are her husband, Phillip Crain of Lily; her father and step mother, Boyd and Linda Durham of Mt. Vernon; one son, Austin Stewart of Mt. Vernon; one daughter, Alexie Lovell of Mt. Vernon; five brothers, Wayne Durham, Tim Durham and Randy Durham, all of Cincinnati, Ohio and George and Boyd Durham, both of Mt. Vernon; one sister, April Durham of Mt. Vernon; her paternal grandmother, Lucy Durham of Mt. Vernon and her maternal grandmother, Lucille Coffey of Mt. Vernon.

Services will be Thursday, May 10, at 2:00 p.m. at Dowell & Martin Funeral Home with Bro. Adam Dooley officiating. Burial will follow in the Elmwood Cemetery.

## Nancy Wanex

Nancy Spencer Wanex, 55, died Wednesday, May 2, 2001 at Peninsula Regional Medical Center in Salisbury, Maryland. She was born in Berea, the daughter of Delavenia Smith Spencer and the late Thomas Spencer. She was a graduate of Stephen Decatur High School in Berlin and had worked for almost 40 years at Edwards Five and Dime now Edwards Department Store in Ocean City. She was a member of Clear Creek Baptist Church in Berea.

Besides her mother, survivors are: her husband, John Wanex of Berlin; one son and daughter-in-law, John H. Wanex III and Theresa Wanex of Spotsylvania, Virginia; three brothers and sisters-in-law, Thomas Edward, Sr. and Elaine Spencer of Berea, Wayne and Alice Spencer of Tuscon, Arizona and James and Dawn Spencer of Selbville; two sisters and a brother-in-law, Bonnie S. and Rick Arnone of Jupiter, Florida and Connie Spencer of Berlin and several nieces and nephews. She was preceded in death by a brother, Colin Spencer.

A memorial service was held on Sunday, May 6 at the First Baptist Church of Berlin.

Donations maybe made to the First Baptist Church of Berlin, 613 William St., Berlin, Maryland 21811.

Arrangements were made by the Burbage Funeral Home in Berlin.



## Bernard Proctor

Bernard Lee Proctor, 76, of Berea, died Saturday, May 5, 2001 at his residence. He was born August 12, 1924 in Rockcastle County the son of Purr Lee and Etta Elizabeth Proctor. He was a member of the Brindle Ridge Baptist Church and was retired from the Bonded Oil Company.

Survivors are four sons, Gary Proctor and wife, Norma of Berea, Wayne Proctor and wife, Doris of Mt. Vernon, Brad Proctor and wife, Linda of Mt. Vernon and Neal Proctor and wife, Maizie of McKee; two daughters, Gail Livesay and husband, Wayne of Berea and Norma Kennedy and husband, Eddie of Berea; 17 grandchildren and 21 great grandchildren. He was preceded in death by his wife, Verla and daughter, Rita Lakes.

Services were Tuesday, May 8, at Dowell & Martin Funeral Home with Bro. Ed Cortez officiating. Burial was in the Rimell Cemetery.

Pallbearers were Kenny Proctor, Eddie Proctor, John Proctor, Mitchell Proctor, Michael Livesay and David Jones.

## Jackie Phillips

Jackie Ellis Phillips, 50, of Conway Road, Berea, died Thursday, May 3, 2001 at UK Medical Center in Lexington. He was born December 25, 1950 in Rockcastle County, the son of the late

The Mt. Ve



## John Miller

John Miller, 88, of Orlando, Wednesday, May 2, 2001 at Sowder Nursing Home in Brod He was born on June 4, 19 Rockcastle County, the son late Harvey and Pliny Cha Miller. He was a retired N Worker and a member of the E Church.

Survivors are his wife, Cora Miller of Orlando; one son, T Miller of Mt. Vernon; two step Wilber and Wayne Weaver bo Orlando; two step daughters, Chasteen of Franklin, Ohio Delphia Murrell of Newport; brother, George Miller of Somer two grandchildren, several step gra children and several step great gra children. He was preceded in de by one son, Hubert Miller; one s son, Elmer Miller; one broth Raymond Miller and two siste Marie Cope and Sallie Thomas.

Services were Friday, May 4th the Maple Grove Baptist Church wi Bro. William Payne officiatin Burial was in the Scaffold Cane Cer etery.



## Virginia Dooley

# Mother's Day

# EXHIBIT E

Department of Justice
Drug Enforcement Administration

## REPORT OF INVESTIGATION

Page 1 of 3

| Program Code | 2. Cross | Related Files | 3. File No. | 4. G-DEP Identifier |
|---|---|---|---|---|
| HID-100 | File | | BA-01-0004 | |
| 5. By: SA Jerel Hughes | ☒ | BA-01-0001 | 6. File Title BULLOCK, Johnny Lee | |
| At London, KY RO | ☐ | | | |
| | ☐ | | | |
| 7. ☐ Closed ☐ Requested Action Completed | ☐ | | 8. Date Prepared | |
| ☐ Action Requested By: | ☐ | | 12/08/00 | |

9. Other Officers: TFO Alan Lewis, FBI SA Tim Briggs, KSP Det. Sgt. Rob Massie, KSP Det. Thomas McKnight, Laurel County Chief Deputy Buddy Blair.

10. Report Re: Acquisition of Information Only Exhibit 1 on 12/07/00 from Johnny Lee BULLOCK.

## DETAILS

1. Reference should be made to all previous DEA 6 reports of Investigation under this File Title and File Number.

2. On 12/07/00, SA Jerel Hughes, TFO Alan Lewis, FBI SA Tim Briggs, KSP Det. Sgt. Rob Massie, KSP Det. Thomas McKnight, and Laurel County Sheriff's Department Chief Deputy Buddy Blair met a KSP/FBI/LCSD Confidential Source at a predesignated location in Laurel County, Kentucky to finalize plans for the CS to make a purchase of Methamphetamine from Johnny Lee BULLOCK.

3. CS advised he/she has purchased approximately 1/8 of an ounce of meth from BULLOCK on more than 30 separate occasions. CS further advised BULLOCK refers to meth as "stuff" and keeps a quantity of it in his pocket to sell.

4. At approximately 12:41 p.m., the CS departed the meet site in route to the BULLOCK residence driven by KSP Det. Thomas McKnight, acting in an undercover capacity. At approximately 1:18 p.m., Det. McKnight equipped the CS with audio recording equipment and gave the CS $500.00 KSP Official Funds in order to purchase methamphetamine from BULLOCK. The aforementioned Agents maintained visual surveillance on the UC/CS until approximately 1:24 p.m., when the UC/CS turned into the drive of the BULLOCK residence. At approximately 1:35 p.m., the UC/CS emerged from the drive of the BULLOCK residence and were surveilled to a

| 11. Distribution: | 12. Signature (Agent) | | 13. Date |
|---|---|---|---|
| Division HQ, DO, SARI | | | 12/08/00 |
| | SA Jerel Hughes | | |
| District | 14. Approved (Name and Title) | | 15. Date |
| | Jerry Carmack | | |
| Other | A/RAC | | 12-12-00 |

EA Form - 6
(Jul. 1996)

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

Department of Justice
Drug Enforcement Administration

| REPORT OF INVESTIGATION | 1. File No. | 2. G-DEP Identifier |
|---|---|---|
| | BA-01-0004 | |
| *(Continuation)* | 3. File Title BULLOCK, Johnny Lee | |

4.
Page 2 of 3

| 5. Program Code | 6. Date Prepared |
|---|---|
| HID-100 | 12/08/00 |

prearranged meet site.  Det. McKnight obtained one clear plastic baggie containing approximately ¼ ounce of meth from the CS at approximately 1:37 p.m.

5.  At approximately 1:49 p.m., the UC/CS and aforementioned Agents arrived at a prearranged location.  TFO Alan Lewis obtained the audio recording equipment and approximately ¼ ounce of suspected meth from Det. McKnight.

6.  The CS stated he/she purchased ¼ ounce of meth from Johnny Lee BULLOCK for $500.00.  CS advised, upon arrival at the BULLOCK residence, James ISAACS came to the door.  CS asked ISAACS if Johnny (BULLOCK) had any "stuff".  ISAACS went into the residence and then emerged and indicated for the CS to come inside.  CS stated he/she entered the residence and  negotiated the price with BULLOCK of ¼ ounce of meth, agreeing on $500.00.  CS advised BULLOCK retrieved a bagggie from the kitchen and then sat on the couch and weighed out the meth.  CS stated he/she counted out $500.00 to BULLOCK in exchange for the meth, which he placed in his pocket.  CS advised Freddy DENNY and James ISAACS were smoking meth in the residence and that Melissa and Sonya Milburn were present.

## CUSTODY OF EVIDENCE

### DRUG EVIDENCE

1.  Information Only Exhibit 1 is approximately ¼ ounce (6.9 grams) of methamphetamine that was purchased by a KSP/FBI/LCSD CS from Johnny Lee BULLOCK on 12/07/00.  Information Only Exhibit 1 was taken into and will remain in the custody of the Kentucky State Police.

### NON-DRUG EVIDENCE

1.  Any and all non-drug evidence (video/audio tapes, etc.) was taken into and will remain the custody of the Kentucky State Police.

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

# EXHIBIT F

KSP 5

| INFORMANT CODE NUMBER | 00-976 |
|---|---|

**Name** BAIN STACEY

| Race | Sex | DOB | Height | Weight | Hair | Eyes |
|---|---|---|---|---|---|---|
| W | F | 4-15-73 | 5'6" | 120 | RED | BRN |

**Aliases**

**Address** P O BOX 882 MT. VERNON KY

**Phone numbers** 606 256-1763

**Contr officers** LEWIS

**Crimial Record**

**Remarks** 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

PHOTO

## RECORD OF USE AND RELIABILITY

| Date | Complaint | Amount | | Purpose |
|---|---|---|---|---|
| 10-7-2000 | 33-00-772 | 150 00 | | LEWIS |
| 01-6-2001 | 33-01-0040 | 200 00 | | LEWIS |
| 01-2-2001 | 33-01-0040 | 100 00 | | MASSIE |

**KENTUCKY STATE POLICE**
**SOUTHEASTERN REGIONAL FORENSIC LABORATORY**
**P.O. BOX 870, 1001 WEST 5TH STREET**
**LONDON, KENTUCKY 40743**
**(606) 877-1464 (Office)**
**(606) 878-0643 (Fax)**

**LABORATORY NO.** 01-5-00159
**CASE NO.** 33-01-0040
Re: Bullock, John (S)

## REPORT OF FORENSIC LABORATORY EXAMINATION

SUBMITTED BY: Det. Alan Lewis, KSP DE/SI-East | CO: 102

RECEIVED: DATE: 1/16/01 TIME: 1520 hrs. VIA: Det. A. Lewis

RETURNED TO: Held for Release DATE: VIA:

**MATERIAL SUBMITTED:**

Exhibit 1: Cellophane bag containing approximately 13.783 grams (0.486 ounce) of a light brown substance.

**EXAMINATION REQUESTED:**

Identification of Controlled Substances

**RESULTS OF EXAMINATION:**

Exhibit 1 was found to contain 59% methamphetamine hydrochloride (a controlled substance).

Date Completed: 1/17/01

ah

_Hary Hay_

**SIGNATURE OF EXAMINER** **KSP 35 6-86**
**Henry Hays U/1550**

# EXHIBIT H

## REPORT OF INVESTIGATION

Page 1 of 3

| 1. Program Code HID-100 | 2. Cross File ☒ BA-01-0001 | Related Files | 3. File No. BA-01-0004 | 4. G-DEP Identifier |
|---|---|---|---|---|
| 5. By: TFO Alan Lewis  At: London, KY  RO | | | 6. File Title BULLOCK, Johnny Lee | |
| 7. ☐ Closed ☐ Requested Action Completed  ☐ Action Requested By: | | | 8. Date Prepared 01/17/01 | |

9. Other Officers: FBI SA Tim Briggs, KSP Det. Thomas McKnight, Laurel County Dep. Buddy Blair

10. Report Re: Acquisition of Information Only Exhibit 2 on 1/16/01 from Johnny Lee BULLOCK.

### SYNOPSIS

On 01/16/01, a FBI/KSP/LCSD Confidential Source, at the direction of law enforcement, purchased approximately ½ ounce of methamphetamine from Johnny Lee BULLOCK..

### DETAILS

1. Reference should be made to all previous DEA 6 Reports of Investigation under this File Title and File Number.

.. On 1/16/01, TFO Alan Lewis, FBI SA Tim Briggs, KSP Det. Thomas McKnight, and Laurel County Sheriff's Department Chief Deputy Buddy Blair met a KSP/FBI/LCSD Confidential Source at a predesignated location in Rockcastle County, Kentucky to finalize plans for the CS to make a purchase of methamphetamine from Johnny Lee BULLOCK.

3. The CS advised Law Enforcement Officers BULLOCK had ½ ounce of Methamphetamine for him/her (CS) and wanted        . The CS was given $925.00 in KSP official funds to purchase the methamphetamine from BULLOCK. The CS was searched by TFO Lewis at        , prior to departing with Det. McKnight who was acting in an undercover capacity as a driver. SA Briggs equipped the CS with a audio recorder prior to Det. McKnight and the CS departing the meet site. Departure for the BULLOCK residence was at 12:44 p.m. with aforementioned Agents maintaining a visual surveillance on the UC/CS until the UC/CS turned                At 1:04 p.m. the UC/CS departed the BULLOCK

| 11. Distribution: Division HQ, DO, SARI  District  Other | 12. Signature (Agent) TFO Alan Lewis | 13. Date 1/18/01 |
|---|---|---|
| | 14. Approved (Name and Title) Jerry Carmack A/RAC | 15. Date |

EA Form - 6 (Jul. 1996)

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

J-194

| REPORT OF INVESTIGATION | 1. File No.<br>BA-01-0004 | 2. G-DEP Identifier |
|---|---|---|
| *(Continuation)* | 3. File Title BULLOCK, Johnny Lee | |
| 4.<br>Page  2  of  3 | | |
| 5. Program Code<br>HID-100 | 6. Date Prepared<br>01/17/01 | |

residence and  Det. McKnight recovered a brown pill bottle containing approximately ½ ounce of methamphetamine from the CS.

4.   At 1:06 p.m. Det. McKnight searched the CS and deactivated the audio recorder at 1:09 p.m. The UC/CS arrived at a prearranged meet site with Det. McKnight turning over the suspected methamphetamine to TFO Lewis and the audio recording to SA Briggs.

5.   The CS stated he/she had purchased the ½ ounce of suspected methamphetamine from Johnny BULLOCK for $925.00. CS advised upon arrival John BULLOCK, Vernon DENNY, Alexus CRANE and 2 unidentified white males were inside the residence. James ISSACS was observed outside the residence. The CS asked BULLOCK if he had what he/she needed. BULLOCK went outside and returned with a bag of suspected methamphetamine in his hand. BULLOCK then removed part of the contents from the bag and weighed it on a set of black digital scales on the floor in front of the couch. BULLOCK then placed the suspected methamphetamine in a plastic bag inside a pill bottle and gave it to the CS. The CS then returned to the vehicle which Det. McKnight occupied and turned over the suspected methamphetamine and audio recorder to Det. McKnight.

6.   Det. McKnight stated that he had observed BULLOCK exit the residence and obtain a bag from a junked vehicle. BULLOCK then returned to the inside of the residence.


CUSTODY OF EVIDENCE

DRUG EVIDENCE

1.   Information Only Exhibit #2 is 13.783 grams of methamphetamine that was purchased by a KSP/FBI/LCSD CS from Johnny Lee BULLOCK on 1/16/01. Information Only Exhibit #2 was taken into and will remain in the custody of the Kentucky State Police.

---

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

Department of Justice
Drug Enforcement Administration

| | 1. File No. BA-01-0004 | 2. G-DEP Identifier |
|---|---|---|
| **REPORT OF INVESTIGATION** *(Continuation)* | 3. File Title BULLOCK, Johnny Lee | |
| 4. Page 3 of 3 | | |
| 5. Program Code HID-100 | 6. Date Prepared 01/17/01 | |

## NON-DRUG EVIDENCE

1.  Any and all non-drug evidence (video/audio tapes, etc.) was taken into and will remain in the custody of the FBI.


## INDEXING

1.  BULLOCK, Johnny Lee               NADDIS █████

2.  CRANE, Alexus                     NADDIS █████
    W/F, no other identifiers available at this time.

3.  ISSACS, James                     NADDIS █████
    W/M, 5' 07", 150 lbs., gray hair/beard

    DENNY, Vernon                     NADDIS █████
    W/M, no other identifiers available at this time.

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

# EXHIBIT I

COPY

1
2

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
LONDON

3

4

UNITED STATES OF AMERICA,    )  London Criminal
                         )  No. 01-21
      Plaintiff,       )

5

                         )
-vs-                   )  January 7, 2002

6

                         )  9:35 a.m.
JOHNNY LEE BULLOCK,      )

7

TROY KIRBY,            )  VOLUME II
                         )

8

      Defendants.      )

9

10

TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE JENNIFER B. COFFMAN
UNITED STATES DISTRICT JUDGE AND A JURY

11

12

APPEARANCES:

13

For the Plaintiff:      Stephen Smith, Esq.
                         Martin Hatfield, Esq.

14

                         601 Meyers Baker Road, Suite 200
                         London, Kentucky  40741

15

For the Defendant:      Fred White, Esq.
(Johnny Lee Bullock)    105 South Broad Street

16

                         P.O. Box 1808
                         London, Kentucky  40743-1808

17

18

For the Defendant:      Bruce Bentley, Esq.
(Troy Kirby)           P.O. Box 915
                         London, Kentucky  40743

19

20

21

Court Reporter:         Peggy Westman Weber, RPR

22

                         Official Court Reporter
                         P.O. Box 362

23

                         Lexington, Kentucky  40585-0362
                         859/254-5564

24

25

Proceedings recorded by mechanical stenography,
transcript produced by computer.

28

1          Now, let's listen to those tapes, and then I will
2    hear your arguments on those.
3          MR. SMITH:  Your Honor, if I may approach the
4    audio equipment?
5          THE COURT:  You may.  Do whatever you need to.
6          Are we ready to go?
7          MR. SMITH:  Are we ready to go?
8          AUDIO TECHNICIAN:  December 12th?
9          MR. SMITH:  December 7th.
10          THE COURT:  Now, are we hearing one tape after
11    another?
12          MR. SMITH:  If that's appropriate and okay with
13    the Court, I have both ready to go.
14          THE COURT:  Okay.  Well, let's just listen to both
15    of them.
16          MR. SMITH:  They are short.  Six minutes and seven
17    on the other.
18          THE COURT:  Okay.
19      (Whereupon, the audiotape was heard by the Court,
20    attorneys, and parties in open court by the use of
21    headphones.)
22          THE COURT:  Do we need to talk, Mr. White?
23          MR. WHITE:  He hasn't heard anything.
24          DEFENDANT JOHNNY LEE BULLOCK:  I haven't heard
25    anything.

29

1          THE COURT:  Is there anyone who hasn't heard?

2          Mr. Kirby, could you hear?

3          DEFENDANT TROY KIRBY:  Yes.

4          THE COURT:  All right.  Let's -- why don't we take

5  a little break, and let's let Mr. Bullock listen to the

6  tape during the break.

7          We will take a break for 15 minutes.

8      (Whereupon, a recess was taken.)

9          THE COURT:  All right.  We have had a break.

10          Mr. White, has your client listened to the tape

11  now?

12          MR. WHITE:  Yes, Your Honor.

13          THE COURT:  Okay.  Let's listen to the other one.

14  And if you can't hear it now, raise your hand.

15      (Whereupon, the audiotape was heard by the Court,

16  attorneys, and parties in open court by the use of

17  headphones.)

18          THE COURT:  Okay.  Mr. White, it is your motion.

19  Let's hear what you have to say about those tapes.

20          MR. WHITE:  On the first one --

21          THE COURT:  Would you mind moving to the podium,

22  so the microphone can pick you up?

23          MR. WHITE:  Excuse me.

24          On the first tape I hear a drug deal go down.

25  It's clearly not my client.  And I am not sure he takes

1  BY MR. WHITE:

2  Q.  Do you remember debriefing the confidential source now?

3  A.  Yes; yes, I did.

4  Q.  What you've got in front of you, what is that?

5  A.  This is a DEA-6 report of investigation, titled

6  Acquisition of Information on the Exhibit 1, on 12/7/2000,

7  from Johnny Lee Bullock.

8  Q.  And is this something you normally prepare after

9  debriefing a witness or after you debrief a confidential

10 source?

11 A.  This is something I prepare after I utilize the

12 confidential source to purchase narcotics.

13 Q.  And this is accurate to the best of your belief?

14 A.  Yes, to the best of my knowledge.

15 Q.  And generally you prepare these documents, you purport

16 to make them accurate; is that correct?

17 A.  This is true, yes.

18 Q.  And is there anything in there that you see is not

19 accurate?

20 A.  Not at this time, not to my knowledge.

21 Q.  I believe in the last paragraph as to her statement,

22 she makes mention as to who was at Mr. Bullock's residence

23 during this buy.  Is there any mention of Alexa Crain, Will

24 Baker, or Johnathon Cromer being there?

25 A.  Could you repeat that list of names again?

1    THE COURT:  No, that's okay.  I didn't really

2  understand factually where that fit in when we were at the

3  bench.  And I'm still not sure I understand factually where

4  it fits in, but clearly it has to be analyzed under the

5  same framework.

6    MR. HATFIELD:  I don't -- I think there was a

7  little bit of a misunderstanding about that.  I don't think

8  anybody ever came back.  I think that was in reference to

9  this second buy in January.

10    Is that right?

11    MR. SMITH:  Yes.

12    THE COURT:  I understood from Mr. Smith that at

13  some later time Stacy Crain told somebody that, well, Alexa

14  Crain was present at that first transaction on the first

15  tape.

16    MR. SMITH:  It was the second transaction on

17  January 16th that she related that to Detective Alan Lewis,

18  which was recorded in a DEA-6, but it wasn't prepared by

19  Special Agent Hughes who is on the stand now.

20    THE COURT:  Okay.

21    MR. SMITH:  So that's why.

22    THE COURT:  Are we going to get into that?

23    MR. SMITH:  Well, I feel that, obviously, we don't

24  have that issue before us at this point.  Maybe we need not

25  address it until it comes up.

159

1  attorneys.

2          MR. BENTLEY:  Yes.  That's what she had told me as

3  well.

4          THE COURT:  All right.  I think we're -- then

5  everybody is on an equal footing.  That's good.

6          Okay.  Let's say that the attorneys will be here

7  at 9:15 in the morning.  We will see if we have any

8  outstanding issues.  I don't know of anything that will

9  take us over 15 minutes to resolve.  Then we will try to

10  get started at 9:30.

11          Okay.  I think that's all for the day.  Everything

12  is rolling smoothly.  I know it takes awhile to get

13  started, but we will make it roll right now.

14          Madam Clerk -- Madam Marshal, I wish you would

15  announce a recess until 9:15 in the morning.

16     (Whereupon, the jury trial proceedings adjourned at

17  4:05 p.m.)

18               C E R T I F I C A T E

19          I, Peggy Westman Weber, certify that the foregoing

20  is a correct transcript from the record of proceedings in

21  the above-entitled matter.

22

23  _____         _____

Date

24                              Peggy Westman Weber
                                Registered Professional Reporter
25